PUBLIC UTILITY COMMISSIONER OF OREGON; Pacific Power & Light, a Maine corporation; Portland General Electric Company, an Oregon corporation; and CP National Corporation, a California corporation, Plaintiffs,

v.

BONNEVILLE POWER ADMINISTRATION, and Peter T. Johnson, Administrator, Bonneville Power Administration, Defendants,

and

Aluminum Company of America; Arco Metals Company; The Carborundum Company; Georgia-Pacific Corporation; Intalco Aluminum Corporation; Kaiser Aluminum & Chemical Corporation; Martin Marietta Aluminum, Inc.; Oregon Metallurgical Corporation; Pacific Carbide & Alloys Company; Pennwalt Corporation; and Reynolds Metals Company, Defendant-Intervenors.

Civ. No. 84–270–PA.

United States District Court,
D. Oregon.

March 21, 1984.

---

Marcus Wood, Guy A. Randles, Pamela L. Jacklin, Stoel, Rives, Boley, Fraser & Wyse, Portland, Or., for plaintiffs Pacific Power & Light Co., The Montana Power Co. and CP Nat. Corp.

Alvin Alexanderson, James C.L. Baxendale, Portland General Elec. Co., Portland, Or., for plaintiff Portland General Elec. Co.

Paul A. Graham, Asst. Atty. Gen., State of Or., Salem, Or., for plaintiff Public Utility Com'r of Oregon.

Charles H. Turner, U.S. Atty., Jack G. Collins, Chief, Civil Div., Thomas C. Lee, Asst. U.S. Atty., David J. Adler, Sp. Asst. U.S. Atty., D. Or., Portland, Or., John A. Cameron, Asst. Gen. Counsel, Bonneville Power Administration, Portland, Or., for defendants.

Michael C. Dotten, Portland, Or., Jonathan Ater, Grant E. Tanner, Lindsay, Hart, Neil & Weigler, Portland, Or., M. Laurence Popofsky, Peter A. Wald, Dian M. Grueneich, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for defendant-intervenors.

## OPINION AND ORDER

PANNER, District Judge.

This case arises under the Pacific Northwest Electric Power Planning and Conservation Act (Northwest Power Act, or Act), Pub.L. No. 96–501, 94 Stat. 2697 (1980), 16 U.S.C. § 839 et seq. (Supp. V 1981). Plaintiffs are the Public Utility Commissioner of Oregon and three investor-owned electric utilities. Defendants are the Bonneville Power Administration (BPA) and its Administrator, Peter Johnson (Johnson). Plaintiffs contend defendants have absolutely predetermined the outcome of certain rate proceedings. They seek an order delegating to an independent hearings officer the further development of these rates. Johnson would retain the authority to decide whether or not to adopt in total the hearings officer's recommendations.

The Ninth Circuit has observed that the Northwest Power Act's "unusual judicial review provisions," *Forelaws on Board v. Johnson*, 709 F.2d 1310, 1311 (9th Cir. 1983), "raise[ ] procedural problems that must be resolved on a case-by-case basis." *Public Power Council v. Johnson*, 674 F.2d 791, 793 (9th Cir.1982) (citation omitted). This case presents for the first time the question whether an interlocutory review of a BPA rulemaking proceeding, where the challenge is on constitutional grounds and concerns the development of rates, belongs in the Ninth Circuit or district court. I conclude I lack jurisdiction. Defendants' motion to dismiss for lack of subject matter jurisdiction is GRANTED.

## BACKGROUND

One of the reasons Congress enacted the Northwest Power Act was to reduce the disparity in electric rates paid by residential customers of Northwest investor-owned utilities (IOUs) such as plaintiffs Pacific Power and Light and Portland Gen-

eral Electric and of BPA's preference customers (publicly-owned utilities or municipalities, public utility districts and cooperatives). The method Congress chose to effectuate this purpose is called the "residential exchange." Section 5(c)(1) of the Act provides:

> Whenever a Pacific Northwest electric utility offers to sell electric power to the Administrator at the average system cost of that utility's resources in each year, the Administrator shall acquire by purchase such power and shall offer, in exchange, to sell an equivalent amount of electric power to such utility for resale to that utility's residential users within the region.

16 U.S.C. § 839c(c)(1).

The residential exchange allows IOUs to exchange their own higher priced power at its "average system cost" for an equivalent amount of lower cost BPA power, in an amount sufficient to meet increasing percentages of the demand of the IOUs' residential and small farm load. Congress required that IOUs pass through the "cost benefits" of the exchange to their residential and small farm customers. 16 U.S.C. § 839c(c)(3). Thus, the residential exchange brings direct rate relief to these customers. *See generally* H.R.REP. NO. 976, 96th Cong., 2d Sess., Part II, at 34–35, 47–48, *reprinted in* 1980 U.S.CODE CONG. & AD.NEWS 5989, 6023, 6032–33, 6045–46; H.R.REP. NO. 976, 96th Cong., 2d Sess., Part I, at 60–61; Mellem, *Darkness To Dawn? Generating and Conserving Electricity in the Pacific Northwest: A Primer on the Northwest Power Act,* 58 WASH.L.R. 245, 253 n. 62 (1983).

Prior to July, 1985, BPA is to recoup exchange costs—the price differential between an IOU's average system cost and BPA's preference rate—primarily by charging higher rates to its industrial customers (the direct service industries, or DSIs). *See* 16 U.S.C. § 839e(c)(1)(A). After July, 1985, other BPA customer classes may bear a greater portion of the costs of the exchange. *See* 16 U.S.C. § 839e(c)(1)(B). However, the DSI rates

are not to be lower than those in effect on June 30, 1985 (the DSI "floor" rate). *See* 16 U.S.C. § 839e(c)(2).

In section 5(c)(7) of the Act, Congress specified how an electric utility's average system cost (ASC) is to be calculated:

> The "average system cost" for electric power sold to the Administrator under this subsection shall be determined by the Administrator on the basis of a methodology developed for this purpose in consultation with the [Northwest Power Planning] Council, the Administrator's customers, and appropriate State regulatory bodies in the region. Such methodology shall be subject to review and approval by the Federal Energy Regulatory Commission. Such average system cost shall not include—
>
>> (A) the cost of additional resources sufficient to serve any new large single load of the utility;
>>
>> (B) the cost of additional resources sufficient to meet any additional load outside the region occurring after December 5, 1980 [the date of enactment of the Act]; and
>>
>> (C) any costs of any generating facility which is terminated prior to initial commercial operation.

16 U.S.C. § 839c(c)(7).

In practice, only dollars are exchanged, not electric power. BPA's system schedulers do not dispatch any electric power and transmission line losses are not incurred in any power transfer. The ASC methodology is a rate formula. Before the methodology becomes finally effective, it must be approved and confirmed by the Federal Energy Regulatory Commission (FERC). *See generally* "Filing of rate schedules for sales of electric power under the Pacific Northwest Electric Power Planning and Conservation Act," 18 C.F.R. § 35.13a (1983) (a 24-page guide to filing residential exchange rates).

Pursuant to section 5(c)(7), the Administrator established BPA's first average system cost methodology on August 26, 1981. FERC approved the methodology on an interim basis on October 14, 1981. *See* 46

Fed.Reg. 50,517 (1981). It approved the methodology on a final basis on September 27, 1983. Title 18 C.F.R. § 35.13a(d)(6) provides:

> The Administrator, at his or her discretion, or upon written request ... shall initiate a consultation process as provided for in section 5(c) of the Regional Act. After completion of this process, the Administrator may propose a new ASC methodology, provided that any consultation process may not be initiated sooner than 1 year after the immediately previous ASC methodology has been adopted by Bonneville and approved by the FERC.

BPA contends FERC's 1981 interim approval meets the requirements of the above provision. *See* 48 Fed.Reg. 48,829 at 48,830 (1983).

On October 7, 1983, BPA initiated a consultation process now in progress to develop a new ASC methodology. *See* 48 Fed. Reg. 45,829 (1983). On February 3, 1984, the Administrator issued a proposed new ASC methodology. *See* 48 Fed.Reg. 4230 (1984). BPA indicated it would accept written comments on the proposed ASC methodology until March 15, 1984, and written replies to the first round of comments until April 9, 1984. *Id.* Defendants state that following completion of the noticed public comment procedures, "the Administrator intends to establish a new improved ASC methodology." Defendants' Memorandum in Support of Motion to Dismiss for Lack of Subject Matter Jurisdiction, p. 6.

Plaintiffs offer the affidavits of David F. Bolender, president of Pacific Power & Light Company, and Robert H. Short, chairman of the board and chief executive officer of Portland General Electric Company. They state that Johnson told them he is committed to reducing BPA's industrial rates by lowering the average system cost calculation for exchanging utilities, thus raising residential rates.

## DISCUSSION

■ Section 9(e)(5) of the Northwest Power Act provides:

> Suits to challenge the constitutionality of this chapter, or any action thereunder, final actions and decisions taken pursuant to the chapter by the Administrator or the [Northwest Power Planning] Council, or the implementation of such final actions ... shall be filed in the United States court of appeals for the region.... Suits challenging any other actions under this chapter shall be filed in the appropriate court.

16 U.S.C. § 839f(e)(5). To summarize, the Ninth Circuit has exclusive jurisdiction to review (1) suits challenging the constitutionality of the Northwest Power Act or any "action" thereunder, (2) suits challenging final actions and decisions taken under the Act by BPA's Administrator or the Northwest Power Planning Council, and (3) suits challenging the implementation of final actions.

There is no contention here that Johnson has taken any "final action" concerning the average system cost methodology. Nor is there a contention that the present lawsuit challenges the "implementation" of the residential purchase and sale agreements, although these agreements are final actions. Rather, the parties and I have focused on the first clause of section 9(e)(5).

■ Plaintiffs base their complaint in large part on the due process clause of the fifth amendment. *See* Complaint for Declaratory and Injunctive Relief, ¶ 18. They want judicial action "to insure the rulemaking process is fundamentally fair." *Id.*, ¶ 1. Defendants and defendant-intervenors contend the constitutional basis of the complaint makes this lawsuit one "to challenge the constitutionality of this chapter, or any action thereunder...." 16 U.S.C. § 839f(e)(5).

Plaintiffs contend the word "action" in the quoted clause means the same thing as "agency action" in the Administrative Procedure Act (APA), 5 U.S.C. § 551(13): " 'agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act...." They con-

trast this definition with that for "agency proceeding" under the APA: " 'agency proceeding' means an agency process as defined by paragraphs (5) ['rule making'], (7) ['adjudication'], and (9) ['licensing'] of this section...." 5 U.S.C. § 551(12). By this reasoning, a challenge to the constitutionality of BPA's ASC methodology rulemaking proceeding does not fall within the exclusive jurisdiction of the Ninth Circuit. Rather, such a challenge is a "[s]uit[ ] challenging any other action[ ] under this chapter [which] shall be filed in the appropriate court." 16 U.S.C. § 839f(e)(5). Plaintiffs contend the U.S. District Court for the District of Oregon is "the appropriate court."

Plaintiffs find some support for their position in *Association of National Advertisers v. Federal Trade Commission*, 627 F.2d 1151 (D.C.Cir.1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980). The plaintiffs there tried to disqualify Michael Pertschuk, a Federal Trade Commissioner, from acting in an FTC proceeding concerning children's television. Review of the FTC's final action on the subject would be in the court of appeals. *See id.* at 1158; 15 U.S.C. § 57a(e)(1)(A) (1976). Nevertheless, the District of Columbia Circuit held the district court "clearly had jurisdiction—*i.e.* power—to resolve the controversy under 28 U.S.C. § 1331(a) (cases arising under the Constitution and laws of the United States)...." 627 F.2d at 1157. *But see id.* at 1177–81 (Leventhal, J., concurring) (concluding that jurisdiction to consider an interlocutory review of the agency's rulemaking process lay with the court of appeals, not the district court).

One problem with plaintiffs' position is that it ascribes a different meaning to the word "action" in the first sentence of section 9(e)(5) than to the word "actions" in the last sentence of the same section. If the first "action" does not encompass a BPA rulemaking proceeding, it is difficult to see how such a proceeding can be "any other action[ ]" subject to challenge "in the appropriate court."

A second problem with plaintiffs' position is that, notwithstanding the rationale of *Association of National Advertisers*, it would bifurcate judicial review of the ASC methodology. Once BPA has promulgated the methodology and FERC has confirmed and adopted it, judicial review will lie in the Ninth Circuit. *See* 16 U.S.C. § 839f(e). If judicial intervention in BPA's ongoing rulemaking proceeding is justified, it makes sense for the court with jurisdiction to review the final action to intervene. In doing so, the Ninth Circuit would be acting in the nature of mandamus to preserve its prospective jurisdiction. *Cf.* Defendant-Intervenors' Memorandum of Law Re Jurisdiction, p. 8. Such a result would avoid creating an "irrational bifurcated system." *National Wildlife Federation v. Johnson*, 548 F.Supp. 708, 710 (D.Or.1982), *aff'd sub nom. Forelaws on Board v. Johnson*, 709 F.2d 1310 (9th Cir.1983).

Finally, plaintiffs' position avoids the apparent welcome the Ninth Circuit recently extended to constitutional challenges to nonfinal BPA rate proceedings. One of the issues in *Central Lincoln Peoples' Utility District v. Johnson*, 735 F.2d 1101 at ___, (9th Cir.1984) (opinion withheld from publication) (*Central Lincoln II*), was whether plaintiffs could obtain Ninth Circuit review of certain BPA rates which had not yet been confirmed by FERC. The Public Power Council (PPC) argued that the Ninth Circuit had jurisdiction to review the rates because section 9(e)(5) declares that " [s]uits to challenge the constitutionality of this chapter, or *any action thereunder* ... shall be filed' in the Ninth Circuit." At 1109–10 (emphasis added by Ninth Circuit). The court stated:

> PPC contends that the rates may be challenged before FERC approval because they are encompassed by the language "any action thereunder." The phrase PPC isolates, however, refers only to challenges that actions taken under the Act are unconstitutional. Since these are not constitutional challenges to BPA's rates, we are constrained by the statute

not to entertain them until the rates have become final.

*Id.*

In summary, given the three reasons outlined above and the plaintiffs' lack of citation to any legislative history supporting their interpretation of the word "action" in section 9(e)(5), I conclude the present action does not belong in this court. Accordingly, defendants' motion to dismiss for lack of subject matter jurisdiction is GRANTED.

IT IS SO ORDERED.