**PUBLIC POWER COUNCIL, a nonprofit corporation, and Public Utility District No. 1 of Clark County, a municipal corporation in the State of Washington, Plaintiffs,**

v.

**Peter T. JOHNSON, Administrator of the Bonneville Power Administration, Donald P. Hodel, Secretary of the Department of Energy, and the United States of America, Defendants,**

**Aluminum Company of America, Arco Metal Company, The Carborundum Company, Georgia-Pacific Corporation, Intalco Aluminum Corporation, Kaiser Aluminum & Chemical Corporation, Martin Marietta Aluminum, Inc., Oregon Metallurgical Corporation, Pacific Carbide & Alloys Company, Pennwalt Corporation, and Reynolds Metals Company, Defendant-Intervenors.**

Civ. No. 84–248–PA.

United States District Court,
D. Oregon.

May 15, 1984.

David Sprayberry, J. Richard Baxendale, Public Power Council, Donald Russo, Blair, Schaefer, Hutchison Wynne, Potter & Horton, Vancouver, Wash., for plaintiffs.

Marcus Wood, Guy A. Randles, Pamela L. Jacklin, Stoel, Rives, Boley, Fraser & Wyse, Portland, Or., for amici curiae.

Jonathan A. Ater, Ronald L. Saxton, Lindsay, Hart, Neil & Weigler, Portland, Or., Eric Redman, Heller, Ehrman, White & McAuliffe, Seattle, Wash., M. Laurence Popofsky, Dian M. Grueneich, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for intervenor Direct Service Industries.

Charles H. Turner, U.S. Atty., District of Oregon, Jack G. Collins, Chief, Civil Division, Thomas C. Lee, Asst. U.S. Atty., John A. Cameron, Jr., Asst. General Counsel, David J. Adler, Bonneville Power Administration, Portland, Or., for federal defendants.

**200**

OPINION AND ORDER

PANNER, District Judge.

This is an action by the Public Power Council, a nonprofit corporation representing publicly—or municipally-owned utilities, public utility districts, and cooperatives, and one of its members, arising out of an alleged breach of contract by the Bonneville Power Administration (BPA). Plaintiffs seek a declaration that the contract has been breached and a delay in the start of BPA's 1985 rate case until the breach has been remedied. Defendants are Peter T. Johnson (Johnson), BPA's Administrator; Donald P. Hodel, Secretary of the Department of Energy; and the United States. A number of direct-service industries (DSIs) have intervened as defendants. Defendants and intervenors moved to dismiss for lack of subject matter jurisdiction. I took their motion under advisement on April 2, 1984, pending trial on the merits on April 27, 1984. I now GRANT their motion and DISMISS this action.

BACKGROUND

The Pacific Northwest Electric Power Planning and Conservation Act (Northwest Power Act, or Act), Pub.L. No. 96–501, 94 Stat. 2697 (1980), 16 U.S.C. § 839 (Supp. V. 1981), created new mechanisms for allocating federally-produced power in the Pacific Northwest and imposed new requirements with respect to ratemaking by BPA, the federal agency charged with marketing that power. *See generally* Finklea, *Bonneville Power Administration Ratemaking: An Analysis of Substantive Standards and Procedural Requirements*, 13 ENVTL.L. 929 (1983). Under the Act, BPA offered new contracts to its customers on August 28, 1981, and within one year nearly all of BPA's existing customers signed new contracts. *See* Mellem, *Darkness to Dawn? Generating and Conserving Electricity in the Pacific Northwest: A Primer on the Northwest Power Act*, 58 WASH.L.R. 245, 249 (1983). The contracts translate the Act's statutory requirements into detailed contractual provisions.

Section 7(b)(2) of the Northwest Power Act, 16 U.S.C. § 839e(b)(2), establishes a rate ceiling for BPA's preference customers, that is, those customers entitled to preference in the sale of federally-marketed power under the Bonneville Project Act and the Northwest Power Act. *See* Finklea, 13 ENVTL.L. at 948. *See generally* Redman, *Preference and Other Clauses in Federal Power Marketing Acts*, 13 ENVTL.L. 773 (1983); Greening, *Bonneville Power Administration's Preference Customers Meet the Northwest Power Act*, 13 ENVTL. L. 809 (1983); Mentor & Jory, *The Preference Clause Revisited: Central Lincoln Peoples' Utility District v. Johnson and the Pacific Northwest Electric Power Planning and Conservation Act*, 58 WASH L.R. 413 (1983). Congress designed the rate ceiling to assure preference customers that "their rates will be no higher than they would have been had the Administrator not been required to participate in power sales or purchase transactions with non-preference customers under this Act." H.R.REP. NO. 976, 96th Cong., 2d Sess., Part I, at 68 (1980) (House Commerce Report) U.S.Code Cong. & Admin.News 1980, p. 5989. The rate ceiling applies beginning July 1, 1985, and is measured using five specific assumptions set out in subsections (A) to (E) of section 7(b)(2), 16 U.S.C. § 839e(b)(2)(A)–(E). If the rate ceiling is triggered in any given rate period, preference customers' rates will be stabilized but revenues not recovered will have to be collected from BPA's other customers through a surcharge. *See* section 7(b)(3), 16 U.S.C. § 839e(b)(3); Finklea, 13 ENVTL.L. at 948–49.

The standard power sales contract entered into between BPA and its preference customers includes as exhibit B forty-eight pages of "General Contract Provisions." Section 8(e) of the General Contract Provisions provides in full:

Bonneville's wholesale power rates established on any Rate Adjustment Date shall be developed consistent with the provisions of section 7 of P.L. 96–501. Bonneville shall develop in consultation

with its utility Customers and shall publish by July 1, 1983, methodologies as required for implementing section 7(b)(2). Complaint, p. 17. BPA and all of its customers subsequently agreed to change the July 1, 1983, date to March 1, 1984.

Plaintiffs contend BPA has breached section 8(e), as amended, by not publishing in the Federal Register by March 1, 1984, a final methodology as contemplated by the parties.

## DISCUSSION

I. *Overview Of Evidence.*

On November 2, 1982, administrator Johnson wrote BPA's customers to propose that the July 1, 1983, date for publication of a rate test methodology be changed to March 1, 1984. In that letter, Johnson stated that "[t]his contract amendment merely postpones by 8 months, to March 1, 1984, the date by which the methodology to implement section 7(b)(2) must be published in the Federal Register." Exhibit 20, p. 2. *See also* Exhibit 16, p. 1. On February 29, 1984, BPA released a 39-page document entitled "Section 7(b)(2) Proposed Rate Test Methodology." Exhibit 7. Although General Contract Provision § 8(e) does not by its terms require publication in the Federal Register, exhibits 20 and 16 establish that BPA understood section 8(e) to impose that requirement. Defendants admit this document was not published in the Federal Register by March 1, 1984. They state the document was published on March 26, 1984. *See* Exhibit 121.

On January 26, 1984, BPA published a request for comments on its proposed legal interpretation of section 7(b)(2). *See* Exhibit 5. In that document, BPA outlined three tasks for the development of a rate test methodology:

The first task in the process to develop a section 7(b)(2) methodology will result in a legal interpretation of the statutory provisions of the rate test ....

To complete the second task, BPA will develop a working, documented computer model of the rate test ....

. . . .

The third task is the release, in draft form, of portions of the 1985 initial rate proposal. This draft initial proposal will discuss the methodologies for BPA's implementation of the rate test. A preliminary draft of this document will be distributed for comment in February 1984. The proposal will outline the application of the section 7(b)(2) rate test in actual rate filings. It will describe how the statutory interpretation has been reflected in the computer model, how the results of the model will be used to determine the necessity for a reallocation of costs under section 7(b)(3) of the Northwest Power Act, and how the level of those costs will be determined for the 1985 test year ....

*Id.*, pp. 1–2.

On March 6, 1984, Johnson stated in a letter that BPA would commence a formal hearing process under section 7(i) of the Northwest Power Act to develop a rate test methodology. *See* Exhibit 108. The process would culminate in a BPA "tentative decision" on June 26, 1984, and the release of a computer model on July 17, 1984. *Id.*

Exhibits 5 and 108 demonstrate that BPA understands section 8(e) to require the section 7(b)(2) rate test methodology to include a computer model. This understanding is further illustrated by the fact that BPA prepared a computer model to aid Congressional comprehension of the rate implications of alternative drafts of the Northwest Power Act. *See* S.REP. NO. 272, 96th Cong., 1st Sess. 56–79 (1979) (Appendix B).

On March 8, 1983, John D. Carr, acting chief of BPA's Wholesale Rates Branch, wrote a letter to "interested parties" noting that most customers had already agreed to Johnson's proposal to change the date in section 8(e) from July 1, 1983, to March 1, 1984. Carr stated that "[t]he success achieved to date in securing these amendments and waivers, while not complete, allows BPA to decide that the formal process for 7(b)(2) will be postponed until the fall of 1983, with a Final Methodology

to be published by March 1, 1984." Exhibit 2, p. 1. Carr had stated on October 1, 1982, that "a final methodology will be published in the FEDERAL REGISTER by July 1, 1983, in compliance with BPA contractual obligations." Exhibit 16, p. 1.

BPA has made clear that it does not view section 8(e) as imposing any requirement that the rate test methodology to be published by March 1, 1984, be "final." Johnson has declared:

> The purpose of this first phase decision [leading to release of a computer model on July 17, 1984] is solely to provide input for BPA's 1985 general rate proceeding. No BPA customer will be affected by this decision until new rates are implemented on July 1, 1985. Thus, BPA does not consider the decision on section 7(b)(2) issues to be final for purposes of judicial review. Even if final, the decision would not be ripe for review until the completion of BPA's 1985 wholesale rate proceeding.

Exhibit 108.

BPA's position is supported by the language of section 8(e) which simply requires the publication of "methodologies as required for implementing section 7(b)(2)." Complaint, p. 17. In addition, Earl Gjelde, BPA's chief negotiator for the 1981 power sales contracts, states:

> The language of GCP [General Contract Provision] section 8(e) represents the complete agreement reached by the contracting parties . . . .
>
> I recall no discussion during the contract negotiations regarding whether the methodology required by GCP section 8(e) was intended to be a "final rate test methodology for the purposes of judicial review," as mentioned in the Third Supplemental Affidavit of Lincoln Wolverton, Attachment A, page 3 (March 28, 1984). The contracting parties generally discussed submission of the rate test methodology to the Federal Energy Regulatory Commission for confirmation and approval; however, the contracting parties did not reach any agreement on this matter.

> The contracting parties never agreed that GCP section 8(e) would preclude BPA from changing the rate test methodology at any time if an error or anomoly [sic] were discovered, including errors discovered during the 1985 general rate proceeding. Such an inhibition could seriously impair BPA's ability to establish rates consistent with all requirements of the Northwest Power Act . . . . I believe that the ability to correct identified problems was an underlying assumption understood by the contracting parties.

Exhibit 114, pp. 2–3.

II. *Jurisdiction.*

■ Section 9(e)(5) of the Northwest Power Act provides:

> Suits to challenge the constitutionality of this chapter, or any action thereunder, final actions and decisions taken pursuant to this chapter by the Administrator or the [Northwest Power Planning] Council, or the implementation of such final actions . . . shall be filed in the United States court of appeals for the region . . . . Suits challenging any other actions under this chapter shall be filed in the appropriate court.

16 U.S.C. § 839f(e)(5). To summarize, the Ninth Circuit has exclusive jurisdiction to review (1) suits challenging the constitutionality of the Northwest Power Act or any "action" thereunder, (2) suits challenging final actions and decisions taken under the Act by BPA's Administrator or the Northwest Power Planning Council, and (3) suits challenging the implementation of final actions.

There is no contention here that the present lawsuit is a constitutional challenge. *Cf. Public Utility Commissioner v. Bonneville Power Administration,* 583 F.Supp. 752, (D.Or.1984) (Opinion and Order) (OPUC I).

Nor is there a contention that Johnson has taken any "final action" concerning the rate test methodology. Indeed, he states

he will not do so until completion of the 1985 rate hearing. When the Ninth Circuit dismissed the companion case filed by plaintiffs, it held that "[t]he facts alleged in the complaint do not comprise a final action by the Administrator of the Bonneville Power Administration warranting review under the grant of original jurisdiction to this court in the Northwest Power Act." *Public Power Council v. Johnson*, No. 84–7154 (9th Cir. Mar. 20, 1984) (Order).

While plaintiffs' challenge is based on a provision in their power sales contracts, and those contracts are final actions, plaintiffs do not allege the "implementation" of a final action. Breaches of a contract do not "implement" the contract.

■■■ The fact that plaintiffs do not appear to state a case within the Northwest Power Act's grant of original jurisdiction to the Ninth Circuit does not *ipso facto* create jurisdiction in this court under the savings clause of section 9(e)(5). ("Suits challenging any other actions under this chapter shall be filed in the appropriate court.") 16 U.S.C. § 839f(e)(5). Rather, jurisdiction lies here only if (1) there is an affirmative basis for jurisdiction * (2) not precluded by the Northwest Power Act.

The Ninth Circuit recently held that it lacked jurisdiction to review certain BPA rates which had not yet been reviewed and

confirmed by the Federal Energy Regulatory Commission. In *Central Lincoln Peoples' Utility District v. Johnson*, 735 F.2d 1101, (9th Cir.1984), *reh'g denied* (May 10, 1984) (*Central Lincoln II*), the court concluded that it lacked jurisdiction to entertain nonconstitutional challenges to rates where its decision might be mooted by subsequent actions of BPA or FERC. *Id.* at 1110 (as modified on rehearing).

I recently dismissed on jurisdictional grounds a case brought by the Public Utility Commissioner of Oregon challenging BPA's proposed changes to the methodology for determining a utility's "average system cost." *OPUC I, supra.* I noted among other things that exercise of jurisdiction by a district court would bifurcate judicial review of the average system cost methodology. *See National Wildlife Federation v. Johnson*, 548 F.Supp. 708, 710 (D.Or.1982), *aff'd sub nom. Forelaws on Board v. Johnson*, 709 F.2d 1310 (9th Cir. 1983).

The Ninth Circuit has never explicitly ruled that a lawsuit challenging BPA ratemaking action on other than constitutional grounds may be filed only in the Ninth Circuit and only after final FERC confirmation. Nevertheless, I believe that conclusion follows naturally from the language of section 9(e)(5), the Ninth Circuit's holding in *Central Lincoln II*, Judge Redden's rea-

---

\* An arguable basis for district court jurisdiction is as follows. The interpretation of a contract to which the United States is a party and where there is need for application of a uniform rule is governed by federal law. *See United States v. Seckinger*, 397 U.S. 203, 209–10, 90 S.Ct. 880, 884–85, 25 L.Ed.2d 224 (1970). In contract cases, where Congress has not expressly provided otherwise, that law is the federal common law of contract. *See Donham v. United States*, 536 F.2d 765, 769 (8th Cir.1976). The United States district courts have federal question jurisdiction over claims founded on federal common law. *See Illinois v. City of Milwaukee, Wisconsin*, 406 U.S. 91, 99–100, 92 S.Ct. 1385, 1390–1391, 31 L.Ed.2d 712 (1972). In the Ninth Circuit, the Tucker Act does not bar district courts from entertaining actions for nonmonetary relief arising out of contracts to which the United States is a party. *See Lehner v. United States*, 685 F.2d 1187, 1190 (9th Cir.1982), *cert. denied*,

460 U.S. 1039, 103 S.Ct. 1431, 75 L.Ed.2d 790 (1983); *Laguna Hermosa Corp. v. Martin*, 643 F.2d 1376, 1379 (9th Cir.1981). Also in the Ninth Circuit, section 702 of the Administrative Procedures Act, 5 U.S.C. § 702, waives sovereign immunity in actions for relief other than money damages. *See Lehner*, 685 F.2d at 1190; *Laguna Hermosa*, 643 F.2d at 1378–79; *Rowe v. United States*, 633 F.2d 799, 801–02 (9th Cir.1980).

I need not decide whether the above analysis is correct, however, if I conclude, as I do, that another statute precludes my exercise of jurisdiction. *See UMC Industries v. Seaborg*, 439 F.2d 953, 955 (9th Cir.1971) ("It is well settled that if Congress, as here, specifically designates a forum for judicial review of administrative action, that forum is exclusive, and this result does not depend upon the use of the word 'exclusive' in the statute providing for a forum for judicial review.") (citations omitted).

soning in *National Wildlife Federation,* and my decision in *OPUC I.*

No matter what methodology BPA ultimately devises to implement section 7(b)(2), plaintiffs will experience no effects of that decision until BPA decides its 1985 rate case. This is because the rate ceiling does not become effective until July 1, 1985. The reason plaintiffs are vigorously contesting BPA's process for developing the section 7(b)(2) rate test methodology is because the methodology chosen will have a direct bearing on how much BPA's preference customers will have to pay for their power after that date. Plaintiffs contend the process for developing a methodology is unfair because BPA will be able to manipulate the methodology as it develops its 1985 rates. Plaintiffs fear BPA will predetermine how much it wants to charge preference customers and then devise a rate test methodology which allows such charges. They argue that the methodology will be so complex that it will be easily subject to manipulation once BPA knows the numbers involved in the 1985 rate case.

The rationale behind the *Central Lincoln II* jurisdictional decision is illuminated both by the very complexity of the rate test methodology and by the fact that plaintiffs may have nothing substantive to complain about after completion of the 1985 rate case. BPA's complex ratemaking determinations should first be reviewed by the Federal Energy Regulatory Commission, and then by the Ninth Circuit. These are the two institutions charged by Congress to supervise BPA's rate decisions.

## CONCLUSION

The Northwest Power Act vests exclusive jurisdiction in the Ninth Circuit to review BPA rate decisions, after those decisions are reviewed and confirmed by FERC. This court is precluded from reviewing BPA rate decisions whether those decisions are final or nonfinal. Accordingly, the motion to dismiss for lack of subject matter jurisdiction is GRANTED.

IT IS SO ORDERED.