**PACIFIC POWER & LIGHT COMPANY, a Maine corporation; Portland General Electric Company, an Oregon corporation; Puget Sound Power & Light Company, a Washington corporation; the Washington Water Power Company, a Washington corporation; Idaho Power Company, a Maine corporation; Utah Power & Light Company, a Utah corporation; the Montana Power Company, a Montana corporation; CP National Corporation, a California corporation; Public Utility Commissioner of Oregon; and Idaho Public Utilities Commission, Plaintiffs,**

v.

**BONNEVILLE POWER ADMINISTRATION, and Peter T. Johnson, Administrator, Bonneville Power Administration, Defendants,**

and

**Aluminum Company of America, Arco Metals Company, the Carborundum Company, Georgia-Pacific Corporation, Intalco Aluminum Corporation, Kaiser Aluminum & Chemical Corporation, Martin Marietta Aluminum, Inc., Oregon Metallurgical Corporation, Pacific Carbide and Alloys Company, Pennwalt Corporation, and Reynolds Metals Company, Defendant-Intervenors.**

Civ. No. 84–261–PA.

United States District Court, D. Oregon.

June 20, 1984.

Marcus Wood, Guy A. Randles, Pamela Jacklin, Stoel, Rives, Boley, Fraser & Wyse, Portland, Or., for plaintiffs Pacific Power & Light Co., CP Nat. Corp., Montana Power Co. and The Washington Water Power Co.

Alvin Alexanderson, James C.L. Baxendale, Portland, Or., for plaintiff Portland General Elec. Co.

Paul A. Graham, Asst. Atty. Gen., Salem, Or., for plaintiffs Public Utility Commissioner of Oregon and Idaho Public Utilities Com'n.

Paul Fortino, Perkins, Coie, Stone, Olsen & Williams, Portland, Or., for plaintiffs Puget Sound Power & Light Co., Utah Power & Light Co., and Idaho Power Co.

Charles H. Turner, U.S. Atty., Jack G. Collins, Chief, Civ. Div., Thomas C. Lee, Asst. U.S. Atty., John A. Cameron, Jr., Asst. Gen. Counsel, David Adler, Kurt R. Casad, Portland, Or., for defendants.

M. Laurence Popofsky, Peter A. Wald, Dian M. Grueneich, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., Eric Redman, Heller, Ehrman, White & McAuliffe, Seattle, Wash., Michael C. Dotten, Special Counsel to Heller, Ehrman, White & McAuliffe, Jonathan A. Ater, Grant E. Tanner, Lindsay, Hart, Neil & Weigler, Portland, Or., for defendant-intervenors Direct Service Industries.

PANNER, District Judge.

Plaintiffs are the Pacific Power & Light Company (PP & L), seven other investor-owned utilities (IOUs), the Public Utility Commissioner of Oregon, and the Idaho Public Utilities Commission. Defendants are the Bonneville Power Administration (BPA) and its Administrator, Peter Johnson. A number of direct service industries (DSIs), which purchase power directly from BPA, have intervened as defendants. Plaintiffs allege BPA has initiated certain rulemaking proceedings in advance of the time allowed by their contracts with the agency. The proceedings are scheduled to culminate shortly in a change in BPA's method for calculating how much it must pay the IOUs for power purchased from them under the "residential exchange" program. Plaintiffs seek a declaration of their contract rights. Defendants move to dismiss for lack of subject matter jurisdiction. I conclude I lack jurisdiction. The motion is GRANTED. Cross-motions for summary judgment are DENIED.

## BACKGROUND

A number of the plaintiffs here filed an action I dismissed in March. *Public Utility Commissioner of Oregon v. Bonneville Power Administration*, 583 F.Supp. 752 (D.Or.1984) (*OPUC I*), on appeal, No. 84–3722 (9th Cir.). *OPUC I* and the present action are companion cases and the "Background" discussion in the *OPUC I* opinion is applicable here. 583 F.Supp. at 753–55. Nevertheless, the facts bear repeating.

This case arises under the Pacific Northwest Electric Power Planning and Conser-

vation Act (Regional Act, or Act), Pub.L. No. 96–501, 94 Stat. 2697 (1980), 16 U.S.C. § 839 et seq. (Supp. V 1981). One of the reasons Congress passed the Act was to reduce the disparity in electric rates paid by residential customers of Northwest IOUs and of BPA's preference customers (publicly-owned utilities or municipalities, public utility districts and cooperatives). *See* Blumm, *The Northwest's Hydroelectric Heritage: Prologue to the Pacific Northwest Electric Power Planning and Conservation Act,* 58 Wash.L.R. 175, 228 (1983). The method Congress chose to effectuate this purpose is called the residential exchange. Section 5(c)(1) of the Act provides:

> Whenever a Pacific Northwest electric utility offers to sell electric power to the Administrator at the average system cost of that utility's resources in each year, the Administrator shall acquire by purchase such power and shall offer, in exchange, to sell an equivalent amount of electric power to such utility for resale to that utility's residential users within the region.

16 U.S.C. § 839c(c)(1).

For the past two and one-half years, residential and small farm customers of the IOUs have benefitted from this provision. Under section 5(c)(1), the IOUs signed contracts with BPA to exchange some of their higher cost power at its "average system cost" (ASC) for an equal amount of lower cost federal hydropower. *See* Mellem, *Darkness to Dawn? Generating and Conserving Electricity in the Pacific Northwest: A Primer on the Northwest*

*Power Act,* 58 Wash.L.R. 245, 253 n. 62 (1983). The IOUs are required to pass the resulting savings in power costs directly through to their residential and small farm customers. *See* 16 U.S.C. § 839c(c)(3). This is done in the form of credits reducing the customers' electric bills. State regulatory commissions monitor the credits to insure the customers receive all of the "cost benefits" to which they are entitled. Thus, the residential exchange brings direct rate relief to these customers. *See generally* H.R.Rep. No. 976, 96th Cong., 2d Sess., Part II, at 34–35, 47–48, *reprinted in* 1980 U.S.Code Cong. & Ad.News 5989, 6023, 6032–33, 6045–46; H.R.Rep. No. 976, 96th Cong., 2d Sess., Part I, at 60–61.

Prior to July, 1985, BPA is to recoup exchange costs—the price differential between an IOU's average system cost and BPA's preference rate—primarily by charging higher rates to the DSIs. *See* 16 U.S.C. § 839e(c)(1)(A). After July, 1985, other BPA customer classes may bear a greater portion of the costs of the exchange. *See* 16 U.S.C. § 839e(c)(1)(B). However, future DSI rates are not to be lower than those in effect for the contract year ending June 30, 1985 (the DSI "floor" rate). *See* 16 U.S.C. § 839e(c)(2). Therefore, a permanent lowering of the DSI floor rate will occur only if changes to the ASC methodology are implemented by July 1, 1984.

Section 5(c)(7) of the Regional Act specifies how a utility's average system cost is to be calculated. 16 U.S.C. § 839c(c)(7).[1] This methodology is subject to review and

---

1. Under section 5(c)(7) of the Regional Act, BPA is obligated to develop a methodology for calculating the utilities' ASC that will assure exclusion of certain costs from the utilities' ASC so that BPA does not subsidize the utilities, or surcharge the DSIs, for those costs.

Section 5(c)(7) of the Regional Act provides in full:

> The "average system cost" for electric power sold to the Administrator under this subsection shall be determined by the Administrator on the basis of a methodology developed for this purpose in consultation with the [Northwest Power Planning] Council, the Administrator's customers, and appropriate State reg-

ulatory bodies in the region. Such methodology shall be subject to review and approval by the Federal Energy Regulatory Commission. Such average system cost shall not include—
> (A) the cost of additional resources in an amount sufficient to serve any new large single load of the utility;
> (B) the cost of additional resources in an amount sufficient to meet any additional load outside the region occurring after December 5, 1980; and
> (C) any costs of any generating facility which is terminated prior to initial commercial operation.

16 U.S.C. § 839c(c)(7).

approval by the Federal Energy Regulatory Commission (FERC). *Id. See generally* "Filing of rate schedules for sales of electric power under the Pacific Northwest Electric Power Planning and Conservation Act," 18 C.F.R. § 35.13a (1983).[2] Pursuant to section 5(c)(7), the Administrator established BPA's first ASC methodology on August 26, 1981. FERC approved the methodology on an interim basis on October 14, 1981. *See* 46 Fed.Reg. 50,517 (1981). It approved the methodology on a final basis on September 28, 1983, and published the methodology in the Federal Register on January 10, 1984. On October 7, 1983, BPA commenced a notice and comment procedure to change the ASC methodology. On May 15, 1984, BPA proposed a revised ASC methodology and requested public comment. BPA indicated it would ask FERC to approve the new methodology by July 1, 1984.

The Residential Purchase and Sale Agreements (residential agreements, or exchange contracts) between BPA and a utility provide that BPA may propose to change the ASC methodology. However, the residential agreements also provide

that such a proposal may be made only after completion of a consultation process. In addition, the contracts provide that no such consultation process can be commenced sooner than one year after the immediately previous ASC methodology has been adopted by BPA and approved by FERC. *See* 18 C.F.R. § 35.13a(d)(6) (1983).[3]

Plaintiffs initially contended the consultation process must have certain characteristics including a negotiation process similar to the process used to develop the original methodology for computing each utility's ASC. However, they have now dropped that claim and focus only on the "one year" requirement. They seek a declaratory judgment that under the terms of their contracts BPA is prohibited from adopting any change to the present ASC methodology that results from a consultation process commencing prior to one year after the date FERC granted final approval to that methodology. The new date for commencement of a consultation process would be September 28, 1984 (one year after final FERC approval).[4]

---

**2.** The ASC methodology provides the basis for the Administrator's individual determinations of the ASC of each exchanging utility. These rate determinations are then reviewed by FERC pursuant to section 9(g), 16 U.S.C. § 839f(g), and become the rates at which the IOUs sell power to BPA under the exchange.

**3.** The Residential Purchase and Sale Agreements incorporate as Exhibit C the average system cost methodology. Section VI of the methodology, Exhibit C, p. 7, provides in full:

The Administrator, at his or her discretion, or upon written request from three-quarters of the utilities who are parties to contracts pursuant to section 5(c) of the Regional Act, or from three-quarters of his preference customers, or from three-quarters of Bonneville's direct-service industry customers, shall initiate a consultation process as provided for in section 5(c) of the Regional Act. After completion of this process, the Administrator may propose a new ASC methodology, provided that any consultation process may not be initiated sooner than 1 year after the immediately previous ASC methodology has been adopted by Bonneville and approved by the FERC.

Affidavit of Marcus Wood in Support of Reply to Defendant-Intervenors' Memorandum of Law

in Support of Motion to Dismiss, Exhibit A, p. 63.

**4.** In beginning the process on October 7, 1983, leading to the present ASC revision proposal, BPA stated:

[T]he new consultation process has been initiated no sooner than 1 year after the previous methodology was adopted by BPA on August 26, 1981, and approved by the FERC on October 14, 1981. *See* 46 F.R. 50,517 (1981), corrected at 46 F.R. 55,952 (1981). Although the FERC approval was granted on an interim basis, this action satisfies the requirements of 18 C.F.R. 35.13a(d)(6).

46 Fed.Reg. 45,829 at 45,830 (1983).

Defendant-Intervenors' Memorandum of Law in Support of Motion to Dismiss, Exhibit D.

Plaintiffs contend the unambiguous language of the contract makes the provisions of Exhibit C a part of the contract. They argue the contract permits alterations of Exhibit C by BPA only in compliance with the contractual limitations. *See* Plaintiffs' Memorandum in Support of Their Motion for Summary Judgment, pp. 5–6. Defendants contend the ASC methodology is an administrative rule of both BPA and FERC. They point to 18 C.F.R. § 35.13a (1983). Defendants argue the ASC methodology is simply incorporated for reference in the exchange

## DISCUSSION

The plaintiffs in *OPUC I* contended BPA and Johnson had absolutely predetermined the outcome of the ASC methodology revision process. They offered the affidavits of David F. Bolender, president of PP & L, and Robert H. Short, chairman of the board and chief executive officer of Portland General Electric Company. Bolender and Short stated that Johnson told them he is committed to reducing BPA's industrial rates by lowering the average system cost calculation for exchanging utilities, thus raising residential rates. Plaintiffs there sought an order delegating to an independent hearings officer the further development of the rates. Johnson would have retained the authority to decide whether or not to adopt in total the hearings officer's recommendations. *See* 583 F.Supp. at 753.

In *OPUC I*, I noted that section 9(e)(5) of the Regional Act provides:

Suits to challenge the constitutionality of this chapter, or any action thereunder, final actions and decisions taken pursuant to this chapter by the Administrator or the [Northwest Power Planning] Council, or the implementation of such final actions ... shall be filed in the United States court of appeals for the region.... Suits challenging any other actions under this chapter shall be filed in the appropriate court.

16 U.S.C. § 839f(e)(5).

Summarizing this provision, I stated that the Ninth Circuit has exclusive jurisdiction to review (1) suits challenging the constitutionality of the Northwest Power Act or any "action" thereunder, (2) suits challenging final actions and decisions taken under the Act by BPA's Administrator or the Northwest Power Planning Council, and (3) suits challenging the implementation of final actions.

*OPUC I*, 583 F.Supp. at 755.

There was no contention in *OPUC I*, nor is there one here, that Johnson had or has taken any "final action" concerning the average system cost methodology. Nor was or is there a contention by plaintiffs or defendants that *OPUC I* or this lawsuit challenge the "implementation" of the residential agreement, although these agreements are final actions. In *OPUC I*, I noted that plaintiffs based their complaint in large part on the due process clause of the fifth amendment. They sought judicial action "to insure the rulemaking process is fundamentally fair." I held the constitutional basis of the complaint made that lawsuit a constitutional challenge that belonged in the Ninth Circuit and not in district court. *Id.* at 756. There are no allegations of constitutional violations in the present case.

Initially, then, it appears that this lawsuit is not one subject to the original jurisdiction of the Ninth Circuit under section 9(e)(5). *Cf. Public Power Council v. Johnson*, No. 84–7154 (9th Cir. Mar. 20, 1984) (*PPC v. Johnson I*). An absence of jurisdiction for the Ninth Circuit does not *ipso facto* create jurisdiction in the district court, however. Although the savings clause of section 9(e)(5) provides that "[s]uits challenging any other actions under this chapter shall be filed in the appropriate court," 16 U.S.C. § 839f(e)(5), jurisdiction lies here only if (1) there is an affirmative basis for jurisdiction (2) not precluded by the Regional Act.

Plaintiffs aver an affirmative basis for jurisdiction by styling their complaint as one seeking a declaratory judgment for breach of contract. I recently dismissed another action against Johnson alleging breach of contract. *Public Power Council v. Johnson*, 589 F.Supp. 198 (D.Or.1984) (*PPC v. Johnson II*). I did not decide there whether plaintiffs had established an affirmative basis for jurisdiction, *see id.* at 203 n. *, because I concluded the Regional Act pre-

---

contracts and that those contracts were executed after the rule was adopted. "BPA categorically disagrees with plaintiffs' assertion that this incorporation for reference gives the plain-

tiffs contractual rights over application of the rule." Defendants' Supplemental Memorandum, p. 3. Of course, I express no views on the merits of the respective positions.

cluded my exercise of jurisdiction. I reach the same conclusion here.

In *PPC v. Johnson II*, the Public Power Council and one of its members sought a declaration that BPA had breached a provision of the power sales contracts between BPA and its preference customers. There is a basic procedural similarity between that case and the present one not contradicted by the fact that plaintiffs there also sought a delay in the start of BPA's 1985 rate case until the breach was remedied. That additional relief would have been founded on the declaration of contractual rights.

Plaintiffs in *PPC v. Johnson II* alleged BPA breached section 8(e) of the General Contractual Provisions of their power sales contracts by not publishing in the Federal Register by March 1, 1984, a final methodology for calculating certain rates. Under section 7(b)(2) of the Regional Act, 16 U.S.C. § 839e(b)(2), preference customers' rates are to be no higher than they would have been had the Regional Act not been passed and BPA not required to sell power to nonpreference customers. The section 7(b)(2) "rate ceiling" applies beginning July 1, 1985. *See id.* at 204. *See generally* Finklea, *Bonneville Power Administration Ratemaking: An Analysis of Substantive Standards and Procedural Requirements*, 13 Envtl.L. 929, 948–49 (1983).

I noted the Ninth Circuit recently held that it lacked jurisdiction to review certain BPA rates which had not yet been reviewed and confirmed by FERC:

> In *Central Lincoln Peoples' Utility District v. Johnson* [735 F.2d 1101] *et al.* (9th Cir.1984), *reh'g denied* (May 10, 1984) (*Central Lincoln II*), the court concluded that it lacked jurisdiction to entertain nonconstitutional challenges to rates where its decision might be mooted by subsequent actions of BPA or FERC. *Id.* at [1109] (as modified on rehearing).

589 F.Supp. at 203. I also recalled my observation in *OPUC I* that exercise of jurisdiction by a district court would bifurcate judicial review of the average system cost methodology. *Id.* at ——. *See OPUC*

*I*, 583 F.Supp. at 756; *National Wildlife Federation v. Johnson*, 548 F.Supp. 708, 710 (D.Or.1982), *aff'd sub nom. Forelaws on Board v. Johnson*, 709 F.2d 1310 (9th Cir.1983). While recognizing that the Ninth Circuit has never explicitly ruled that a lawsuit challenging BPA ratemaking action on other than constitutional grounds may be filed only in the Ninth Circuit and only after final confirmation by FERC, I stated my belief that that conclusion follows naturally from the language of section 9(e)(5), the Ninth Circuit's holding in *Central Lincoln II*, Judge Redden's reasoning in *National Wildlife Federation*, and my decision in *OPUC I*. *See PPC v. Johnson II*, 589 F.Supp. at 203–04. Next, I commented that no matter what methodology BPA ultimately devises to implement the 7(b)(2) rate ceiling, preference customers will experience no effects of that decision until BPA decides its 1985 rate case. The fact that preference customers might have nothing substantive to complain about after completion of the 1985 rate case supported my conclusion that

> BPA's complex ratemaking determinations should first be reviewed by the Federal Energy Regulatory Commission, and then by the Ninth Circuit. These are the two institutions charged by Congress to supervise BPA's rate decisions.

*Id.* at 204. I concluded very simply:

> The Northwest Power Act vests exclusive jurisdiction in the Ninth Circuit to review BPA rate decisions, after those decisions are reviewed and confirmed by FERC. This court is precluded from reviewing BPA rate decisions whether those decisions are final or nonfinal.

*Id.* I therefore granted the motion to dismiss for lack of subject matter jurisdiction. *Id.*

Plaintiffs have made an able effort to distinguish the cases just discussed, particularly *PPC v. Johnson II*. Through excellent briefs and argument, they have caused me to carefully reexamine the rationale of my previous decisions. Nevertheless, I again conclude that Congress did not in-

tend district courts to hear this type of case.

Plaintiffs argue their case is not a rate matter but rather a straight-forward breach of contract action. Although plaintiffs seek to characterize their remaining claim as a pure contract issue unentangled with the merits or procedure of BPA's rate proceeding, my exercise of jurisdiction would necessarily impact the course of the 1985 rate case. This is so because the ASC methodology affects BPA's revenue requirements and individual rate designs for exchanging utilities.

The net cost of the exchange subsidy is a very substantial portion of BPA's annual revenue requirements. Those requirements must be recovered through BPA's rates for electric power sales. *See* 16 U.S.C. § 839e(a). In any year, BPA forecasts the amount of its revenue requirements, including the cost of the residential exchange. For the 1984–85 contract year, this forecast must be made by or about July 1, 1984, if the statutorily-imposed deadline for completion of the 1985 rate case is to be met. *See, e.g.,* 16 U.S.C. §§ 839e(b)(2) and 839e(c)(1)(B). Plaintiffs concede that BPA must forecast its revenue requirements for the period new rates will be in effect in order to establish rates for that period. *See* Plaintiffs' Supplemental Memorandum in Opposition to BPA's Motion to Dismiss for Lack of Subject Matter Jurisdiction, p. 7. At least until July 1, 1985, the residential exchange subsidy is the single most important cost used to determine the rates BPA charges the DSIs. *See* 16 U.S.C. § 839e(c)(1)(A).

The Supreme Court recently cited the technical nature and complexity of the residential exchange and its interrelationship with BPA's rates to the DSIs as a justification for giving the Administrator "broad discretion" in his interpretation of the Regional Act's provisions. *Aluminum Company of America v. Central Lincoln Peoples' Utility District,* — U.S. —, —, 104 S.Ct. 2472, 2485, 81 L.Ed.2d 301 (1984) (*Central Lincoln I*).

After describing the residential exchange and quoting legislative history regarding the relationship between the exchange and the rates BPA charges the DSIs, the Supreme Court stated:

[T]he DSI sales and the power exchange program are integrally related. BPA's ability to finance the exchange program is related to the amount of power that BPA sells to DSIs, which in turn is determined by the interruptibility terms of the new DSI contracts. It is the responsibility of the Administrator to manage the complex relationship among these various aspects of the statute, and, absent an express statutory statement requiring particular terms in the contracts, it is appropriate that we give him broad discretion to determine them.

— U.S. at — — —, 104 S.Ct. at 3484–85. More generally, the Supreme Court noted that "BPA has longstanding expertise" in the area of marketing federally-produced hydropower and was "intimately involved" in drafting the Regional Act. *Id.* at —, 104 S.Ct. at 2480. "[T]he Administrator's interpretation of the Regional Act is to be given great weight." *Id.*

Plaintiffs are correct that the ASC methodology is not a section 7 rate matter. However, it is a rate matter in a more general sense. I previously stated that the "ASC methodology is a rate formula." *OPUC I,* 583 F.Supp. at 754. The Regional Act expressly refers to the ASC determinations for each exchanging utility, which are made using the ASC methodology, as "rates." *See* 16 U.S.C. § 839f(g). And, as just described, ASC issues are interwoven into section 7 rate determinations. The more important issue, though, is not whether the timing of revisions to the ASC methodology is a "rate matter" or "not a rate matter." Rather, the critical point is whether Congress has already specified a procedure for review of plaintiffs' claim. It has.

Congress created a specific administrative process for development of the ASC methodology, ensuring that administrative review proceeds judicial review. The pro-

cess consists of two basic steps prescribed by statute: first, development of the methodology through consultation with various parties and second, review and approval by FERC. *See* 16 U.S.C. § 839c(c)(7). These steps, taken in order, provide an efficient mechanism for administrative review followed by judicial review. The first step is complete or nearly so. The Administrator has asked FERC to attempt to complete the second step on an interim basis by the end of this month. Letter of Peter T. Johnson to Honorable Raymond J. O'Connor, May 25, 1984, Defendants' Second Supplemental Memorandum, Exhibit 3. Once these steps are taken and the ASC methodology is approved by FERC, a final action has occurred which is subject to judicial review in the Court of Appeals for the Ninth Circuit.

Plaintiffs argue that since section 9(e)(1)(G), 16 U.S.C. § 839f(e)(1)(G), lists "final rate determinations under section 7" as final action subject to judicial review, the failure expressly to list "final rate determinations under section 5" or include similar language means the Ninth Circuit does not have exclusive jurisdiction to review issues concerning the ASC methodology. However, Congress declared in section 9(e)(3) that "[n]othing in this section shall be construed to preclude judicial review of other final actions and decisions by the [Northwest Power Planning] Council or Administrator." 16 U.S.C. § 839f(e)(3). There is no question but that FERC's final approval of the ASC methodology will be a "final action" under section 9(e)(3) and thus reviewable pursuant to section 9(e)(5). 16 U.S.C. § 839f(e)(5).

It is a "long-settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Bakersfield City School District v. Boyer*, 610 F.2d 621, 626 (9th Cir.1979), quoting *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–464, 82 L.Ed. 638 (1938) (Brandeis, J.).[5] Requiring ex-

---

5. Plaintiffs' approach to the question of timing of judicial review has been contradictory. On the other hand, they argue a declaratory judgment is needed now to avert the possibility of retroactive charges to the DSIs being imposed several years hence to remedy an illegally early change in the ASC methodology. At one point, they even suggest the DSIs may choose to close their plants and desert the region rather than pay such massive, judicially-mandated refunds to the IOUs.

On the other hand, plaintiffs argue that if I require BPA to keep the present ASC methodology in effect for the time being, and the ASC methodology is then changed later in the 1984–85 contract year, a rebate or surcharge is entirely feasible:

In past rate proceedings, BPA has recognized that its predicted costs attributable to the residential exchange may differ from the costs actually incurred. Differences may occur either because future payments under the ASC methodology differ from BPA's estimates or because the ASC methodology itself is changed. Therefore, in its 1983 rate case, BPA adopted an "exchange adjustment clause" (EAC) and included that clause in many of its rate schedules. The current EAC will remain in effect at least until June 30, 1985. Application of the EAC will result in an adjustment by way of a rebate or surcharge, if the actual costs of the residential exchange differ substantially from those forecast. If the Administrator chooses to continue the EAC in BPA's

1985 rates, this EAC automatically could accommodate any future modification to the ASC methodology.

Plaintiffs' Supplemental Memorandum in Opposition to BPA's Motion to Dismiss for Lack of Subject Matter Jurisdiction, pp. 8–9. In the past, FERC has granted interim approval to BPA's ASC methodology only on condition that provision be made for refunds to exchanging utilities in the event that FERC ultimately disapproves the methodology. *See* 46 Fed.Reg. 50,-517 at 50,519 (1981).

I agree with defendants:

If plaintiffs prevailed in the Ninth Circuit, the court could order that the ASC methodology not be effective until a time prescribed by the court. A decision upon remand could require refunds for any over-collections by BPA during the period the new methodology was in effect. *Cf. Cities of Anaheim v. FERC,* 723 F.2d 656 (9th Cir.1984). The amount of the refunds could be calculated by comparing the ASC rates that would have been determined under the old methodology with rates determined under the new methodology. This provides complete relief to plaintiffs....

Defendants' Second Supplemental Memoranda, pp. 9–10. The Ninth Circuit could make a retroactive adjustment of rates. But if I were to intervene now, it could throw the 1985 rates process completely out of kilter because the exchange represents such a substantial part of BPA's revenue requirements. Plaintiffs lose

haustion of administrative channels and the formulation of a final administrative order ensures against premature, possibly unnecessary, and piecemeal judicial review.[6] Plaintiffs are not left without judicial recourse. Defendants and defendant-intervenors concede that all of plaintiffs' claims in this action will be fully reviewable in the Ninth Circuit following FERC action.[7] *See* Defendant-Intervenors' Memorandum of Law in Support of Motion to Dismiss, p. 19; Defendants' Second Supplemental Memorandum, pp. 9, 13.

The present lawsuit indisputably challenges an administrative proceeding that is statutorily designed to result in final agency action reviewable in the Ninth Circuit pursuant to sections 9(e)(3) and 9(e)(5) of the Regional Act.[8] "It is well settled that if Congress, as here, specifically designates a forum for judicial review of administrative action, that forum is exclusive, and this result does not depend upon the use of the word 'exclusive' in the statute providing for a forum for judicial review." *UMC Industries v. Seaborg*, 439 F.2d 953, 955 (9th Cir.1971).

## CONCLUSION

Plaintiffs seek judicial review of nonfinal agency action. Under the Regional Act, I have no authority to give such review. This action is DISMISSED.

IT IS SO ORDERED.

---

nothing by having to await FERC review before pursuing their claims at the court of appeals.

**6.** Immediate judicial review is not appropriate where the ASC methodology cannot take effect until approved by FERC on at least an interim basis. Moreover, if judicial intervention in BPA's ongoing rulemaking proceeding to revise the ASC methodology is justified, it makes sense for the court with jurisdiction to review the final action to intervene. *Cf. OPUC I*, 583 F.Supp. at 756.

**7.** Plaintiffs also suggest that unlike section 7 rate decisions, where BPA creates a complete record for FERC and Ninth Circuit review, there will be no further discovery concerning BPA's interpretation of the ASC methodology change provision if this lawsuit is terminated. Accordingly, plaintiffs argue Congress did not intend to exclude district courts, where discovery is routinized, from exercising jurisdiction over this type of case.

Plaintiffs' argument ignores the first Public Power Council case under the Regional Act, *Public Power Council v. Johnson*, 674 F.2d 791 (9th Cir.1982). In that case the Ninth Circuit denied BPA's motion to quash certain subpoenas issued for depositions and other discovery materials. Plaintiffs, a number of BPAs preference customers, challenged the power sales con-

tracts offered to them by BPA. They contended the contracts were not negotiated as to all relevant terms and that BPA's negotiations were in bad faith. They asserted that a "complete administrative record" was "required for fair judicial review of their claims," and insisted such a record was not yet before the appeals court. *Id.* at 793. BPA brought a motion to quash on the ground that the Ninth Circuit's review was limited to the agency record. A Ninth Circuit motions panel denied the motion and allowed discovery to proceed. In a short but thorough opinion the court outlined various circumstances justifying expansion of the record on appeal. The case illustrates that plaintiffs' future discovery needs can be accommodated even though they will have to file a new case within the Ninth Circuit's original jurisdiction following FERC approval of the ASC methodology.

**8.** As noted, the ASC methodology is a rate formula developed pursuant to section 5, rather than section 7, of the Regional Act. Accordingly, judicial review of the ASC methodology need not await FERC's final action on the 1985 rate case. Through sections 5(c)(7), 9(e)(3), and 9(e)(5), Congress authorized the Ninth Circuit to review the final ASC methodology independently of the 1985 rate case. The critical point is that the statutory procedure set forth in these sections have not yet been satisfied.