The **CITY OF SEATTLE, City Light Department; City of Eugene, by the Eugene Water & Electric Board; Public Utility District No. 1 of Chelan County, Washington; City of Tacoma; Public Utility District No. 1 of Grant County, Washington; Central Lincoln Peoples' Utility District; Clatskanie Peoples' Utility District; Tillamook Peoples' Utility District and Public Utility District No. 1 of Douglas County, Washington, Plaintiffs,**

v.

Peter **JOHNSON, as Administrator, Bonneville Power Administration; Donald P. Hodel, as Secretary of the Department of Energy; and the United States of America, Defendants.**

**Civ. No. 83–1923.**

United States District Court, D. Oregon.

Oct. 11, 1984.

Alan S. Larsen, Donald A. Haagensen, Schwabe, Williamson, Wyatt, Moore & Roberts, Portland, Or., for plaintiffs.

Charles H. Turner, U.S. Atty., Thomas C. Lee, Asst. U.S. Atty., Preston Michie, Kurt Casad, Gen. Counsel, Portland, Or., for defendants.

## OPINION AFTER REHEARING

LEAVY, District Judge:

Plaintiffs are a number of publicly-owned utilities in Oregon and Washington and purchase substantial amounts of power from the Bonneville Power Administration (BPA). As preference customers, they are entitled to certain benefits in the purchase of this power, including a lower price than other customers receive. Plaintiffs purchase power pursuant to a generic power sales contract (Requirements Contract, exhibit A to Second Amended Complaint). They contend this contract entitles them to require BPA to include the full energy output of the Hanford Generating Project (Hanford Project, or Hanford) in the resources BPA uses to serve plaintiffs. Plaintiffs contend BPA has violated the contract by selling half of Hanford's output to several investor-owned utilities (IOUs). They seek a declaration that defendants—Peter Johnson, Administrator of BPA, Donald P. Hodel, Secretary of the United States Department of Energy, and the United States—have violated the contract by excluding half of the output of the Hanford Project from the Federal Base System (FBS) Resources. Further, they ask for an injunction prohibiting defendant from excluding any portion of Hanford's output from the FBS Resources.

Defendants move to dismiss for lack of subject matter jurisdiction and failure to state a claim. Alternatively, they request summary judgment on the ground ·that plaintiffs' claim is barred by the statute of limitations. I conclude the complaint states a "rate matter" over which the United States Court of Appeals for the Ninth Circuit has exclusive jurisdiction. Accordingly, the motion to dismiss for lack of subject matter jurisdiction is GRANTED.

## BACKGROUND

The Hanford Generating Project consists of a nuclear reactor (referred to as the Hanford New Production Reactor or NPR) owned and operated by the United States Department of Energy (DOE) for the production of weapons grade plutonium, and steam-driven turbines owned and operated by the Washington Public Power Supply System (WPPSS). As a byproduct of plutonium manufacture, the New Production Re-

actor produces steam useful for producing electricity. The DOE, and its predecessor the Atomic Energy Commission (AEC), has been selling steam to WPPSS for twenty years. On July 9, 1982, WPPSS and DOE contracted for continued sale of steam from July 1, 1983, to June 30, 1993. This contract was limited by the Atomic Energy Commission Authorization Act for 1963:

> (e) The [Atomic Energy] Commission [now DOE] shall not enter into any arrangements for the sale of byproduct energy [steam] from the Hanford New Production Reactor unless it determines. that the purchaser [WPPSS] has offered fifty per cent participation to private organizations [IOUs] and fifty percent participation to public organizations on a non-discriminatory basis in the sale of electric energy generated therewith.

Pub.L. No. 87–701, § 112(e), 76 Stat. 599, 604 (Sept. 26, 1962).

In 1963, the AEC contracted to sell byproduct steam to WPPSS. WPPSS then assigned the right to fifty percent of the electric power produced by Hanford to five investor-owned utilities (Montana Power Company, Pacific Power & Light Company, Portland General Electric Company, Puget Sound Power & Light Company, and the Washington Water Power Company) and certain publicly-owned utilities including plaintiffs. The IOUs and publicly-owned utilities then assigned to BPA their rights to receive electric power produced from Hanford in exchange for rights to receive specified amounts of electric power from BPA.

BPA became involved with Hanford through these 1963 exchange contracts. The contracts shifted the risk from the IOUs and publicly-owned utilities to BPA of the "dry hole" danger that no steam would be available from the NPR. BPA promised to deliver electric energy whether or not Hanford was in production. Additionally, since BPA agreed to sell power at its usual rates, the contracts removed the disincentive for the IOUs and publicly-owned utilities to invest in Hanford. That disincentive was created by the fact that in 1963 the cost of power from Hanford was substantially greater than the cost of power BPA marketed from federal hydroelectric facilities.

The amount of electric energy BPA was obligated to deliver to the IOUs until June 30, 1983, was specified in a 1974 contract (the "1974 Agreement"). The 1974 Agreement provided the five IOUs with an option to purchase from BPA an amount of energy equal to one-half of that produced by Hanford after October 31, 1977, at a specified price:

> Each company shall have the option to purchase up to one-tenth of the net energy output available due to continued operation of the Hanford Project after October 31, 1977. As payment for such energy the company shall pay one-tenth of the [Washington Public Power] Supply System's annual budget for the project during the period of operation less one-tenth of the amounts specified in section 11(b) of the Exchange Agreement for the related periods ending June 30, 1980, and less one-tenth of any debt service on the Hanford project for each contract year thereafter. The amounts to be paid for lesser amounts of energy would be ratably reduced. The company may assign all or a portion of its share to the remaining companies subject to the same terms and conditions.

1974 Agreement, p. 3, ¶ 1 (exhibit A to Defendants' Memorandum in Support of Renewed Motion to Dismiss). BPA, as of April, 1984, was apparently still supplying Hanford energy to two IOUs.[1]

---

1. In June, 1983, the IOUs indicated their collective intent to exercise their option to purchase from BPA between July 1, 1983, and June 30, 1993, an amount of energy equal to one-half of that produced by Hanford. At that time, the Montana Power Company declined to exercise its option under the 1974 Agreement but offered its share to the remaining IOUs, three of which indicated they would purchase that energy. Then, on March 5, 1984, Portland General Electric indicated it no longer wished to purchase its ten percent share of the Hanford energy and did not assign its right to another company. On March 30, 1984, the Washington Water Power

## DISCUSSION

### I.

Plaintiffs do not seek an injunction prohibiting BPA from selling to investor-owned utilities half of the output of the Hanford Project. Their goal is more subtle. To understand plaintiffs' objectives requires a foray into BPA ratemaking.

In 1980, Congress enacted the Pacific Northwest Electric Power Planning and Conservation Act (Regional Power Act, or Act), Pub.L. No. 96–501, 94 Stat. 2697 (1980), 16 U.S.C. § 839 et seq. (Supp. V 1981). The Act created "a rigid scheme of rate pools and rate limits" to govern BPA's decisions on the rates it charges to publicly-owned utilities, investor-owned utilities, and direct service industries (DSIs). Finklea, *Bonneville Power Administration Ratemaking: An Analysis of Substantive Standards and Procedural Requirements*, 13 Envtl.L. 929, 943 (1983) [hereinafter cited as *BPA Ratemaking*]. The Act gave parties new procedural rights in the ratemaking process, including the right to hearing and reasonable cross examination. Regional Power Act, § 7(i), 16 U.S.C. § 839e(i). *See BPA Ratemaking*, 13 Envtl.L. at 943. Once BPA's Administrator makes a final decision on rates, the rates go into effect after review and approval by the Federal Energy Regulatory Commission (FERC). *Id. See* Regional Power Act, §§ 7(i)(6), 7(k), 16 U.S.C. §§ 839e(i)(6), 839e(k).

Section 7(b) of the Regional Power Act governs the development of rates for BPA's "priority firm power customer class." This class includes plaintiffs. That section provides:

(1) The Administrator shall establish a rate or rates of general application for electric power sold to meet the general requirements of public body, cooperative, and Federal agency customers within the Pacific Northwest, and loads of electric

utilities under section 839c(c) of this title [residential exchange program]. Such rate or rates shall recover the costs of that portion of the Federal base system resources needed to supply such loads until such sales exceed the Federal base system resources. Thereafter, such rate or rates shall recover the costs of additional electric power as needed to supply such loads....

16 U.S.C. § 839e(b)(1). In other words, as long as the total demand of preference customers does not exceed the total supply of the Federal Base System Resources, BPA is to charge plaintiffs rates based on the costs of the FBS Resources.

In fact, plaintiffs purchase power from BPA at the "PF–83" rate which is comprised of eighty-two percent FBS Resources and eighteen percent "Exchange" resources. Exchange resources are those resources acquired by BPA pursuant to the "residential exchange" program. *See* Regional Power Act, § 5(c), 16 U.S.C. § 839c(c). (This program is distinct from the Hanford "exchange" contracts). FBS Resources are less expensive than other resources marketed by BPA, including Exchange resources. If all of Hanford's output were included in FBS Resources, rather than just half the output, the PF–83 rate would consist of a higher percentage of less expensive FBS Resources (and a lower percentage of more expensive Exchange resources). This would likely result in a reduction in the PF–83 rate.

The Regional Power Act defines Federal Base System Resources as follows:

(10) "Federal base system resources" means—

(A) the Federal Columbia River Power System hydroelectric projects;

(B) resources acquired by the Administrator under long-term contracts in force on December 5, 1980; and

Company indicated it no longer wished to purchase its share of the Hanford energy and it, too, did not assign its right to another company. By letters dated March 16, 1984, and April 4, 1984, respectively, BPA notified the two compa-

nies that it would treat the energy the companies declined to purchase as additional energy available to BPA for disposal without obligation to any company.

**310**

(C) resources acquired by the Administrator in an amount necessary to replace reductions in capability of the resources referred to in subparagraphs (A) and (B) of this paragraph.

Regional Power Act, § 3(10), 16 U.S.C. § 839a(10). *See generally* Mellem, *Darkness to Dawn? Generating and Conserving Electricity in the Pacific Northwest: A Primer on the Northwest Power Act,* 58 Wash.L.R. 245, 258–62 (1983) [hereinafter cited as *Darkness to Dawn?*].

It appears that the Hanford project was a resource "acquired by the Administrator under [a] long-term [contract] in force on December 5, 1980 ...." 16 U.S.C. § 839a(10)(B). *See Darkness to Dawn?,* 58 Wash.L.R. at 262 & n. 135. Plaintiffs do not allege, however, that the Regional Power Act requires that the entire Hanford output be included in the FBS Resources. Rather, plaintiffs rest their case on the Requirements Contracts they signed with BPA in 1982.

The Regional Power Act mandated that BPA offer new contracts to its customers within nine months of enactment. BPA made the offer and essentially all of BPA's customers signed on. *See Darkness to Dawn?,* 58 Wash.L.R. at 249. Plaintiffs signed Requirements Contracts with BPA, so denominated because they obligate BPA to meet the net firm energy requirements of these utilities. *See id.* at 254–57.

The generic Requirements Contract provides in part:

(c) *Federal Base System Resources.* The firm capability of the Federal base system resources shall be calculated from:

(1) the firm capability of the Federal Columbia River Power System hydroelectric projects, existing or hereafter constructed;

(2) the firm capability of resources listed below acquired by Bonneville under long-term contracts in force on the effective date of P.L. 96–501:

| | Installed Capability (MW) |
|---|---|
| (A) Hanford | 860 |
| (B) WNP No. 1 | 1250 |
| (C) WNP No. 2 | 1100 |
| (D) 70% of WNP No. 3 | 1240 |
| (E) 30% of Trojan | 1130 |
| (F) Peak/Energy Exchange (PNW and PSW) | N/A |
| (G) Wind turbines | 7.5; and |

(3) the firm capability of resources acquired by Bonneville to replace reductions ....

(Requirements Contract, § 7(c) (Aug. 25, 1981), exhibit A to Second Amended Complaint). Although plaintiffs do not specify on which sections of the contract they rely, section 7(c) appears to be the pertinent one. I assume that 860 megawatts represents the full output of the Hanford Project.[2]

## II.

Plaintiffs' condensed view of the preceding discussion follows. BPA markets power to various classes of customers from various generating resources with differing costs. (Second Amended Complaint, ¶ 14). The Requirements Contract mandates that BPA serve plaintiffs and the other publicly-owned utilities at a cost based on the use of Federal Base System Resources until the capability of such resources is exhausted. (*Id.,* ¶ 15). The Requirements Contract provides that the entire output of the Hanford Generating Project be included as an FBS Resource with its associated costs. (*Id.,* ¶ 16). Other resources marketed by BPA are more expensive than FBS Resources. (*Id.,* ¶ 17). In violation of the Requirements Contract, BPA is only treating half of the Hanford output as an FBS Resource, and is selling the other half directly to certain investor-owned utilities. (*Id.,* ¶ 18). Plaintiffs seek a declaration of their contract rights and an injunction prohibiting BPA from excluding any portion of Hanford's output from the FBS Resources.

2. Incorporated into the Requirements Contract is an Exhibit A entitled "Wholesale Power Rate Schedules and General Rate Schedule Provi-sions," but plaintiffs did not include this exhibit in the attachment to their Second Amended Complaint.

Defendants contend that the court lacks jurisdiction to entertain plaintiffs' complaint.

In recent months, Judge Panner of this court has dismissed on jurisdictional grounds three cases arising under the Regional Power Act. *Public Utility Commissioner of Oregon v. Bonneville Power Administration,* 583 F.Supp. 752 (D.Or. 1984) (*OPUC I*); *Public Power Council v. Peter T. Johnson,* 589 F.Supp. 198 (D.Or. 1984) (*PPC v. Johnson II*); *Pacific Power & Light v. Bonneville Power Administration,* 589 F.Supp. 539 (D.Or.1984) (*PP&L I*). Certain principles of Regional Power Act jurisdiction emerge from the three cases.

First,

the Ninth Circuit has exclusive jurisdiction to review (1) suits challenging the constitutionality of the [Regional] Power Act or any "action" thereunder, (2) suits challenging final actions and decisions taken under the Act by BPA's Administrator or the Northwest Power Planning Council, and (3) suits challenging the implementation of final actions.

*OPUC I,* 583 F.Supp. at 755. *See* Regional Power Act, § 9(e)(5), 16 U.S.C. § 839f(e)(5).

Second,

The [Regional] Power Act vests exclusive jurisdiction in the Ninth Circuit to review BPA rate decisions, after those decisions are reviewed and confirmed by FERC. This court is precluded from reviewing BPA rate decisions whether those decisions are final or nonfinal.

*PPC v. Johnson II,* 589 F.Supp. at 204.

Third, despite a party's attempt to characterize its claim as "a straight-forward breach of contract action ... unentangled with the merits or procedure of BPA's rate proceeding," *PP & L I,* 589 F.Supp. at 545, if Congress has statutorily provided a mechanism for the claim to be reviewed, that mechanism is exclusive. *Id.* at 547.

The above three principles control the jurisdictional question in this case.

Plaintiffs state:

The contractual rights of plaintiffs under their 1982 contracts regarding Hanford can be read in harmony with the contractual rights of the IOUs under all agreements by BPA with the IOUs regarding Hanford. The IOUs' right for Hanford arise from an exchange transaction with BPA and the Washington Public Power Supply System....

Under the exchange agreements the power BPA supplies to the IOUs is related to the entitlement to Hanford that the IOUs have exchanged with BPA. The power BPA supplies to the IOUs can be power from any source and does not depend entirely on the operation of Hanford....

Thus, BPA has acquired a long-term contractual right to 50% of the output from Hanford from the IOUs which, when coupled with the 50% the public agencies have similarly exchanged, results in the 100% of Hanford's generating capability that is designated as a Federal Base System Resource controlled by BPA in plaintiffs' Power Sales [Requirements] Contract. The designation of 100% of Hanford in plaintiffs' contract is independent of BPA's obligation to supply power to the IOUs.

Plaintiffs' claim for relief has no effect on any of BPA's agreement with the IOUs for Hanford....

Plaintiffs' Memorandum in Opposition to Motion to Dismiss, pp. 16–17.

As this statement demonstrates, plaintiffs are not questioning here the *allocation* of Hanford's output between the IOUs and themselves. While a contest of that sort could be expected were the Pacific Northwest suffering from energy insufficiency, *see Darkness to Dawn?,* 58 Wash. L.R. at 276–78,[3] the region presently is surfeited with energy. Rather, plaintiffs' statement is an effective concession that

---

**3.** During a period of insufficiency, BPA may not restrict the entitlements to power of publicly-owned utilities, municipalities, cooperatives, and federal agencies below the total capability of the Federal Base System Resources. *See id.* at 277 & n. 265.

their chief objective is to obtain the *rate benefits* which inclusion of Hanford's full output in the FBS Resources would likely provide.

On rehearing, plaintiffs argued that BPA's allocation of only half of Hanford's output to FBS Resources has detrimental impacts on their power planning and operational needs, as well as their rates. At oral argument, defendants' counsel insisted that BPA has not decided what portion of Hanford's output to include in FBS Resources for power and operational purposes. In the 1983 rate case, the Administrator decided only that "BPA's initial proposal correctly lists one-half of Hanford Output as an FBS energy resource *for ratemaking purposes.*" Administrator's Record of Decision, 1983 Final Rate Proposal, Bonneville Power Administration, United States Department of Energy (Sept. 1983), p. 25 (attached to Defendants' Memorandum in Support of Motion to Amend Findings, p. 19) (emphasis added).

As noted previously, section 7(i) of the Regional Power Act creates new procedures for development of BPA's rates. 16 U.S.C. § 839e(i). Integral to that process is review and confirmation of rates by the FERC *see BPA Ratemaking*, 13 Envtl.L. at 959–61, followed by judicial review at the Ninth Circuit.

The Ninth Circuit recently held that it lacked jurisdiction to review certain BPA rates which had not yet been reviewed and confirmed by FERC. In *Central Lincoln People's Utility District v. Johnson*, 735 F.2d 1101, 1109 (9th Cir.1984), the court concluded that it lacked jurisdiction to entertain nonconstitutional challenges to rates where its decision might be mooted by subsequent actions of BPA or FERC. *Id.* at 1110 (as amended on denial of rehear-

ing). *See also PPC v. Johnson II,* 589 F.Supp. at 203.

Plaintiffs have a statutorily-created mechanism to challenge the exclusion of half of Hanford's output from the FBS Resources. That mechanism is to raise the issue in an appropriate rate case where the exclusion may have an impact on plaintiffs' rates.[4] If BPA acts unfavorably, plaintiffs can challenge BPA's action before FERC. If still unsatisfied, plaintiffs can file a lawsuit in the Ninth Circuit following FERC confirmation of the rates. *See* Regional Power Act, §§ 9(e)(1)(G), 9(e)(5), 16 U.S.C. §§ 839f(e)(1)(G), 839f(e)(5).[5]

## CONCLUSION

Plaintiffs seek to enforce a provision of the Requirements Contract they signed with BPA, looking toward rate benefits from such enforcement. Plaintiffs' appropriate course is to challenge BPA's actions in BPA's rate case proceedings, as they have done. *See supra* notes 4–5. Ultimately, if plaintiffs establish their right to relief, the Ninth Circuit can enforce the contract. Under the Regional Power Act, this court is precluded from considering the complaint.

Defendants' motion to dismiss for lack of subject matter jurisdiction is GRANTED.

---

**4.** Plaintiffs challenged BPA's action in the 1983 rate case which is now pending before FERC. *See* Administrator's Record of Decision, 1983 Final Rate Proposal, Bonneville Power Administration, United States Department of Energy (Sept. 1983), pp. 24–26 (attached to Defendants' Memorandum in Support of Motion to Amend Findings, pp. 18–20).

**5.** If BPA takes final action determining plaintiffs' share of Hanford's output for power and operational purposes, plaintiffs can presumably invoke section 9(e)(5) of the Regional Power Act and seek judicial review directly at the Ninth Circuit. *See* 16 U.S.C. § 839f(e)(5).